## TITCOMB *vs.* POTTER.

Where a defendant, in an action at law, has not used due diligence in making
his defence, or in applying to Chancery for a discovery to assist his defence
at law, he cannot, after a verdict against him, obtain the aid of that Court to
stay the proceedings at law, or have a new trial.

THIS is the same case, in a subsequent stage of its progress,
with those reported in 7 *Greenl.* 302; and 1 *Fairf.* 53. The
additional facts with the arguments of counsel, appear in the opin-
ion of the Court, which was delivered by

PARRIS J. — The respondent, having as Judge of Probate,
prosecuted an action on a probate bond, given by the applicant,
and obtained a verdict, we are now moved as a court of law, to
order a new trial, and as a Court of Chancery, for an injunction
upon the defendant to stay further proceedings in his suit, or in
other words, to deprive him of the fruits of his verdict.

Our first inquiry is, shall a new trial be granted. The ground
upon which this is moved is, that since the trial the applicant has,
under a bill for discovery, obtained possession of sundry letters
and papers important to his defence, which were in the posses-
sion of the adverse party. The action was against the applicant
as administrator of the estate of *Moses Titcomb*, on an alleged
breach of his probate bond, for not inventorying certain notes
given by the applicant to the intestate; and was brought for the
benefit of the heirs at law of said *Moses*. The grounds of defence
were, *first*, that the notes were forgiven in the lifetime of the in-
testate; and, *second*, that the whole estate, including the notes,
was amicably settled among the heirs. The principal circum-
stance in support of the latter point in the defence was, the great
length of time since the decease of the said *Moses* and the taking
of administration by the applicant, which was in 1804; — and
permitting the notes to remain uncalled for, and the whole busi-
ness to sleep until an adjustment might fairly be presumed to have
taken place among all parties interested in the estate.

To rebut this it was contended, that none of the heirs for whose
benefit the suit was prosecuted, knew of the existence of the
notes, and, therefore, the presumption of settlement could not
arise. To account for this want of knowledge, it was proved,
that the large note was taken by *Henry Titcomb*, as agent of

*Moses*, the intestate, together with a mortgage to secure its payment, a short time previous to *Moses'* death, which took place at *Ballstown* springs, in *New York*, in the autumn of 1804;—that the note and mortgage remained in *Henry's* possession and were found among his papers, after his death, by his administrators, in the summer of 1820; soon after which, the suit against the applicant, for not accounting for, or inventorying the note, was commenced. There was no evidence tending to show that either of the heirs, for whose benefit the action was prosecuted, had any knowledge of the existence of the note, or the indebtedness of *Joseph*, the administrator;—and to account for this want of knowledge, the plaintiff showed, by sundry accounts of *Francis* and *Charles Bradbury*, commission merchants of *Boston*, who were the agents and bankers of *Moses*, the intestate, that moneys, particularly a sum of $2400, had been advanced or loaned to *Henry*, by said *Moses*, a short time previous to his death, in 1804, and that this sum had never been collected or accounted for by *Joseph*, the administrator. From these facts, it was argued to the jury, that *Joseph* and *Henry* colluded together to keep from the other heirs a knowledge of the note due from *Joseph*, and the amount advanced or loaned to *Henry* through the *Messrs. Bradbury*.

It is now contended, that the newly discovered evidence does away the foundation of this argument. We do not so understand it. To be sure, it does appear that a small portion of this $2400, to wit, about $300, was applied by *Henry*, under directions from *Moses*, to pay *Mrs. Clark* for the board of one *Samuel Fox*, the ward of said *Moses*. The residue of said sum remains unaccounted for by any evidence offered in the case, either at the trial before the jury, or on the hearing of this motion, and would constitute the basis of an argument proving collusion between *Joseph* and *Henry*, as it did at the trial. In addition to this, there is strong proof in aid of the argument arising out of the books and accounts of *Henry*, which were not used at the trial, but which are admissible in the consideration of this motion, addressed as it is, to the discretion of the Court. The attempt to show that the residue of the $2400 was expended by *Henry* as *Moses'* agent, in certain improvements on his lot and wharf has wholly failed. There are strong reasons for believing that all

those expenses were defrayed out of other advances. Take the case as it now stands upon this point, and the argument of collusion would be bottomed upon the $2100 received by *Henry* through the *Messrs. Bradbury*, and nearly $2000 received by him as rents unaccounted for. In our opinion the whole of the newly discovered evidence upon this point, does not present the case for the applicant, in a point of view at all more favorable than that under which it was presented to the jury.

Again; it was argued to the jury that there was an inducement for collusion between *Joseph* and *Henry*, growing out of *Henry's* private letter, which held out encouragement to *Joseph* that the affairs were so arranged that the " five thousand pieces of eight," originally intended for his son might be secured to him. Such an argument could have had little force, as it is not perceived how an assurance from *Henry* to *Joseph* that he was desirous to accomplish such an arrangement, would have influenced *Henry* to release *Joseph* from his liability on this note ;— or to keep the knowledge of its existence from the other heirs. But whatever force it might have had is not at all diminished by the newly discovered evidence. It does appear that *Henry* had given the same assurance to *Harris*; but that could have had no influence upon his arrangements with *Joseph*. It does not appear that these assurances to *Joseph* or *Harris* were ever fulfilled by *Henry* ;— and whether they were or not, does not at all bear upon the great question involved before the jury, viz. whether the heirs had a knowledge of the existence of the note.

The money, for which the note was given, was furnished by *Moses*, through the *Bradbury's*, as well as that furnished *Henry* ; but there was no evidence at the trial, and none has been furnished under this motion tending to show that either of the heirs, for whose benefit the suit was brought and prosecuted on the probate bond, had knowledge of, or inspected the accounts of the *Messrs. Bradbury*. *Andrew* had an opportunity of doing so ; but the jury found he did not. That question was distinctly presented to them ;— they have passed upon it, and no new evidence material to the point has since been discovered.

But it is urged that *Andrew* had knowledge of the existence of the notes derived from letters in the possession of *Moses*, at

the time of his death, and especially a letter from *Henry*, in which the note and mortgage are particularly mentioned. It was proved at the trial that *Andrew* was with *Moses*, at, and for some time previous to his death; — that he took possession of the papers of the deceased immediately after his death, and brought them to *Stroudwater*, *Andrew's* residence, and retained the custody of them until they were delivered over to *Joseph*.

The jury were told by the Court, in charging upon the facts, that here was an opportunity for *Andrew* to have become acquainted with the contents of the letters in *Moses'* possession, at the time of his death; and if *Andrew* did, by examining the letters from *Henry*, obtain a knowledge of the note in controversy, then he and his representatives ought not to recover.

There is nothing in the newly discovered evidence which shews that *Andrew* did examine the letter from *Henry*, which speaks of the mortgage; — nothing which shews that he made any examination of any of the papers, while at *Ballstown*. After his return, he probably did search for a will, as *Henry* in a letter to *Harris*, says *Andrew* would do so. He might have done so, or he might have delivered all the papers to *Joseph*, the administrator, leaving him to make the search promised by *Henry*. Even if *Andrew* made the promised search, it by no means follows, that he particularly read every letter of recent date, more especially a letter from *Henry*, who was the very person inquiring for the will, and wishing the search. Although it is admitted that the newly discovered evidence, so far as it relates to *Andrew's* attention to *Moses*, during his sickness, and examining or searching for a will after his decease, and *Moses'* ability to give directions as to the disposition of his property, while attended by *Andrew*, is somewhat stronger than that exhibited at the trial, still it falls far short of establishing the fact of knowledge in *Andrew* of the existence of the note or the indebtedness of *Joseph*. As to the alleged forgiveness of the note, there never has been and is not in the case a particle of evidence that the debts due from the relatives were forgiven, or that it was *Moses'* intention, at the time of his death, that his estate in this country should be settled in any other manner than by a just division among all the heirs. On the contrary, there are reasons for concluding that *Moses* gave no

directions upon the subject. He had, but a short time before, directed that this debt against *Joseph* should be secured by mortgage, clearly negativing the idea of gift or forgiveness. He did not think himself dangerously sick, but expected to recover, and this expectation was as lasting as his reason; — and notwithstanding the research that has been made for facts in this case, it remains wholly destitute of an intimation from *Moses*, during his last sickness, of any intention to forgive his debtors, or make an unequal distribution of his property among his relatives. In addition to this it is manifest that the brothers of the intestate did not understand or consider that the debts which they owed *Moses*, at the time of his death, had been forgiven. *Andrew*, to whom it is now contended, that the intention of forgiveness was made known; and who is alleged to have received the direction from *Moses* in his last sickness, could not have so understood it, for he, subsequently, paid the debt, which he owed the estate, to *Joseph*, as administrator. *Benjamin* could not have so understood it, for he also paid the note which *Moses* held against him, to *Joseph*, as administrator; — and the conduct of *Joseph*, in collecting these demands, or even receiving them, is wholly inconsistent with the defence by him now set up, founded on the alleged forgiveness of *Moses*.

Much reliance has been placed, in the argument, upon the fact, that in the month of *February* previous to the death of *Henry*, he exhibited this note to *Benjamin*. It is contended, that if this proof had been exhibited to the jury, they could not have found that *Benjamin* had no knowledge of the existence of the note.

In order to understand the relevancy of this new evidence relating to *Benjamin's* knowledge it is necessary to advert to the points made in the defence before the jury.

The note was given in 1804, and the defendant contended, that the great length of time which had elapsed since the note was given, raised a presumption in law that it had been paid. In answer to this, it was replied, that the note had been kept from the knowledge of the other heirs, by *Henry* and *Joseph*, for their exclusive benefit. The jury were instructed, that if the heirs, for whose benefit the action was brought, knew of the notes and suffered them to remain, it would be strong circumstantial evidence

Titcomb *v.* Potter.

that they did not consider them due. That it was incumbent on them to explain it. If they had claims and they knew it, it is to be presumed that they would enforce their claims. If they omitted to do so, the presumption would be that they had a consciousness of an equitable, if not a legal right against them. But if the note was secreted, as contended by the heirs, no such inference would arise. The charge of the Court, to which neither party excepted, was predicated upon the position, that no presumption could arise unfavorable to the plaintiffs in interest, on account of the delay to commence a suit, unless they knew of the note, on which their claim was founded ; — and, inasmuch as it is not now pretended that *Benjamin* knew of the note until within a few months before the commencement of the suit, we think the presumption does not arise to his prejudice. There is not a particle of evidence that *Benjamin* had any knowledge of the note or mortgage, from 1804, when *Joseph* took letters of administration, until 1829, of course his silence during all this period is satisfactorily accounted for. In *February*, 1829, he, for the first time, became acquainted with the fact of the existence of the note ; and a suit was commenced in *October* of the same year. Surely no presumption unfavorable to his claim could arise from this short delay.

It was also contended to the jury, that it was the intention of *Moses* to have his personal property in this jurisdiction, particularly what might be in the hands of his brothers and sisters, disposed of without the forms of legal administration, and that they and their representatives assented thereto. The jury were instructed, upon this point, that if all the heirs knew of the note, the legal presumption would be, that it was settled among them according to the intentions of *Moses*, or to their mutual satisfaction. The knowledge of *Benjamin* in 1829, clearly could have had no effect or influence upon the jury in their decision upon this point. He knew nothing of the note prior to 1829, and, consequently, could not have taken it into consideration in any settlement to which he might previously have been a party.

It is urged that from the newly discovered evidence it appears that *Mrs. Harris* had knowledge of the note and mortgage. — The only fact, from which this conclusion is drawn, is, that on a

certain occasion, as *Mrs. Harris* says, *Henry* told her that " *Joseph* little thought he had a mortgage of his property," or words of a similar import. What is there in this language that would lead *Mrs. Harris*, or any one else, to suspect that *Henry* alluded to a mortgage given to *Moses* ? *Moses'* name was not mentioned. Nothing is said concerning *Moses'* affairs ; and yet it is argued that because *Henry* said he had or held a mortgage of *Joseph's* house, *Mrs. Harris* must have understood it to be the mortgage given to *Moses* to secure the payment of this note. Far otherwise would be the impression ordinarily made by such language. *Mrs. Harris* might well suppose, she undoubtedly did suppose that it referred to transactions between *Joseph* and *Henry*, in his private capacity, and not having any reference to concerns in which she was interested.

If we were satisfied that it would be promotive of justice to open this case to a new trial, and that the newly discovered evidence is of such weight as ought to influence a jury to give a different verdict, we should, most willingly, grant the motion. But whatever additional evidence has been discovered is so remote from the main questions in the cause, viz. a forgiveness of the debt, a settlement by the heirs, or a knowledge of the note by the heirs, that we do not think it would have weight with a jury sufficient to change the verdict. Two juries have passed upon the facts, and have come to a like conclusion, and although the first verdict was set aside, it was not on account of any irregularity in the trial, as far as it proceeded, but because the jury omitted to assess the damages. Two juries have sanctioned the validity of the claim of these heirs, and we perceive nothing in the additional evidence of sufficient weight to influence another jury to come to a different result.

In addition to the motion for a new trial, we are applied to, in the exercise of our chancery powers, to enjoin the plaintiffs in interest, from further prosecuting their suit at law. The bill, which contains this application as well as a prayer for discovery, was not filed until after the verdict in the action at law ; and the motion for injunction is founded on the evidence disclosed under the bill for discovery. We cannot forbear to notice the great delay, which has attended the prosecution of the original suit, and

to advert to the impropriety of lying by, until after a trial at law and verdict, and then coming in with a bill for discovery in the expectation of eliciting something on which to urge a new trial or injunction.

The original action was commenced in 1829, was tried by jury in this Court in 1830, and again in 1833; — and yet, during all this protracted litigation, no application is made by the defendant to enforce discovery. It is an established principle in chancery, that where a defendant, in an action at law, has not used due diligence in making his defence, or in applying to chancery for a discovery to assist his defence at law, he cannot, after a verdict against him, obtain the aid of that court to stay the proceedings at law, or have a new trial. *Barker* v. *Elkins*, 1 *Johns. Ch. R.* 465, and *Dodge* v. *Strong*, 2 *Johns. Ch. R.* 228, are authorities to this point. It would seem, therefore, that the aid of this Court ought not to have been granted to compel the discovery prayed for, inasmuch as the application was not made in proper season.

But passing by this consideration, what is there in the evidence, either new or old, that would justify us in enjoining this judgment? The debt existed in 1804. The consideration is proved to be money advanced. It is secured by mortgage by special directions of *Moses Titcomb*, the creditor, about one month, only, previous to his death. There is no evidence that this particular debt was forgiven, nor any circumstances in the case tending to show a probability that *Moses* would be more likely to forgive this debt than the debts due from his other brothers. The debts from the others were not forgiven, as is manifest from their conduct in paying, as well as *Joseph's* in receiving them. There was no settlement among the heirs, which included this note. None such has been exhibited. *Benjamin* negatives it in his answer. *Mr. Storer* negatives it in his; — for they both declare that they had no knowledge of the existence of any such note. If there had been any settlement among the heirs including this note, it could not have escaped the knowledge of *these* heirs. *Mr. Storer* was not only an heir acting in his own right, but was a lawyer, counseling and advising, preparing papers and corresponding with *Mr. Metcalf*, relative to the estate at *St. Croix*.

There has never been exhibited a *scintilla* of evidence of any arrangement or adjustment of this note among the heirs, except what grows out of the lapse of time ; and the answers of *Benjamin Titcomb* and *Mr. Storer*, expressly denying knowledge, is a complete avoidance of any presumption arising from that fact.

If these answers speak the truth, it is impossible that this note could ever have been included in any settlement among the heirs. If *Andrew* and *Benjamin* paid the notes, which they owed the estate of *Moses*, and *Joseph* received the payment, which is not even controverted, how can we believe that *Moses*, in his last sickness, forgave to his brothers the debts, which they severally owed him, and communicated the forgiveness to *Andrew*, himself? How can it be that *Andrew* should pay a debt to *Joseph*, as administrator, which *Andrew*, at the same time knew had been forgiven ; — and how can it be that *Joseph*, with the same knowledge, should receive it ? And, we repeat, there is nothing in the case tending to show that *Moses* would have been more likely to forgive this note to *Joseph*, than the note to *Andrew*, who was with the deceased, manifesting the kindest attention, during his sickness.

Whatever obscurity may have been thrown over this case, growing out of the lapse of time, when examined in a court of law, in Chancery that obscurity is wholly removed, at least, so far as it respects *Benjamin* and *Mr. Storer*, by force of their several answers under oath.

If all the heirs, who were living at the time of *Moses*' death, were now living, and should unite in answers similar to those filed by these respondents, a court of Chancery would find no hesitation in disposing of this case with all its incidents.

From the best examination which we have been able to give this case, we do not feel authorised to interpose any obstacle to the rendition of a proper judgment on the verdict, which has already been sustained by the former opinion of this Court ; neither can we grant any injunction to prevent the heirs, the plaintiffs in interest, from realising the fruits of that verdict.

*N. Emery, Longfellow* and *Daveis*, counsel for plaintiff.

*Fessenden* and *Deblois*, for the defendant.